474 F.Supp. 48 (1979)
In the Matter of Philip J. TOPPO d/b/a 4-J Mobile Home Sales & Service, also d/b/a Carlton Heights Estates Mobile Home Park, also d/b/a Jo-Win Trailer Villa and Jane Ann Toppo, Bankrupts.
The FIRST NATIONAL BANK OF PENNSYLVANIA, First National Bank of Mercer County and General Electric Credit Corporation
v.
Philip J. TOPPO et al., Bankrupts, William Pineo, Esq., Trustee.
Civ. A. No. 78-141.
United States District Court, W. D. Pennsylvania.
March 8, 1979.
*49 Stephen Laidhold, Pittsburgh, Pa., for Gen. Elec. Credit Corp.
William Pineo, Meadville, Pa., for Trustee.
Robert Parker, Erie, Pa., for First Nat. Bank of Pa.
Henry Sewinsky, Sharon, Pa., for First Nat. Bank of Mercer County.
Louis Musica, Meadville, Pa., for Bankrupts.

OPINION
KNOX, District Judge.
This matter is before the court on appeal from the orders of the Bankruptcy Judge dated October 13, 1978 dealing with petitions for reclamation filed by First National Bank of Pennsylvania (hereinafter Pa.), First National Bank of Mercer County (Mercer) and General Electric Credit Corporation (GE) of certain property in connection with the debtors' mobile home sales business, Mobile Home Park and other assets and distribution thereof. The matters have been thoroughly briefed and argued by counsel and are before the court for determination. Our conclusions differ somewhat from those of the Bankruptcy Judge mainly as the result of the decision since handed down November 27, 1978, by the Court of Appeals for the Third Circuit in the Matter of H. L. Bennett Company, Bankrupt, 588 F.2d 389.
The facts are set forth in full in the memorandum and order of the Bankruptcy Judge and will not be repeated except where it is necessary for elucidation of this opinion. The order of distribution as entered by the Bankruptcy Judge provided as follows:
"IT IS ORDERED for the foregoing reasons that the proceeds of sale of the various items of collateral sold under stipulation of counsel as above shall be distributed, subject to payment of sale and bankruptcy costs later to be determined, as follows:
1. The $24,800.00 proceeds of sale of 12 mobile home units to The First National Bank of Pennsylvania;
2. The $6,620.50 proceeds from the sale of items for maintenance of the debtor's mobile home park to the First National Bank of Pennsylvania;
3. The $11,554.50 proceeds from the sale of farm machinery, produce and supplies *50 to The First National Bank of Pennsylvania; and
4. The $4,308.15 proceeds of sale of household goods and motor vehicles clear of encumbrances ($2,508.85 from household goods and $1,800.00 from motor vehicles) as follows: the $2,508.85 proceeds of sale of personal property to The First National Bank of Pennsylvania and the $1,800.00 received for the motor vehicles clear of encumbrances to the trustee in bankruptcy.
"IT IS FURTHER ORDERED that the First National Bank of Pennsylvania shall be subrogated to the liens of the local tax authorities against the mobile homes for the taxes assessed against them which it paid in the sum of some $7,000.00 and protected in regard to said payment in the event any different distribution than the above shall be made of the disputed funds on appeal or under later order of court."
We will first deal with the problem of the proceeds of sale in the amount of $24,800 resulting from the sale of twelve mobile home units which was awarded to Pa. Pa. originally entered into a floor plan agreement with the bankrupts on January 24, 1972, to provide financing for their inventory of Mobile Home Sales on Route 322 in Mercer County and a trailer court operated on additional acreage adjacent to that location. This enterprise was known as "4-J Mobile Homes Sales and Service" and other fictitious names as indicated in the caption. The financing statements as filed, however, were invalid because they were executed and indexed in a fictitious name which had not been registered in accordance with the requirements of Pennsylvania law. The fictitious names were not indexed against the names of the debtors Philip J. and Jane Ann Toppo in violation of Section 9-402 of the Pennsylvania Uniform Commercial Code (UCC) (12A Purdon's Pa.Stats. 9-402). The holding of the Bankruptcy Judge is in accordance with the previous holdings in this court. See In re Penn Housing Corp., 367 F.Supp. 661 (W.D.Pa.1973, Weber, D. J.).
In any event, the twelve mobile homes were sold with encumbrances to individual purchasers who resided in the trailer park. The mobile homes were sold under installment sales contracts which were assigned to Pa. and Pa.'s liens were duly noted on the certificates of title issued in the respective purchasers' names. The purchasers defaulted in their payments and Pa. repossessed the units and obtained new titles on various dates from 1974 to October 25, 1976. After the units were repossessed they were left in the bankrupts' possession for resale, under a stipulation and agreement dated December 9, 1976, which agreement is considered a security agreement under the UCC. This agreement is included in Pa.'s Ex. 4 and provides that the bankrupts were Pa.'s uncompensated agents in repossessing, repairing and selling the units. The titles however were issued in the name of Pa. as absolute owners with no encumbrances noted.
The security agreement was duly filed by Pa. in the office of the Prothonotary of Mercer County and financing statements were also filed in the Office of the Secretary of the Commonwealth at Harrisburg, (Penna. Dept. of State) on February 4, 1977. The time stamp shows that the financing statements were received at 9:37 a. m.
Meanwhile, GE had also entered into financing arrangements with the bankrupts and likewise filed financing statements covering their security agreement which financing statements were filed in the Office of the Prothonotary of Mercer County and with the Pa. Dept. of State on February 4, 1977. The time stamp shows that the financing statement was received at 9:04 a. m.
The difficulty with the filings of the financing statements as required under UCC 9-401 was that the GE statement, while bearing a time stamp 33 minutes earlier than the time stamp on the Pa.'s financing statement, nevertheless was given a later number, 8650243, while Pa.'s statements had earlier numbers 8650160, 8650161, 8650 162, the Pa. statements being numbered numbers 81 numerals ahead of GE's statements.
*51 We find that Pa.'s financing statement bore the following description of collateral: "5. This financing statement covers the following types (or items) of property: Security agreements dated January 31, 1977, covering various personal and business property and equipment now owned and hereinafter acquired located at Rte. 322 R.D. 1 Carlton Pa. as specified in the security agreement attached." The difficulty is that the security agreement was not attached. This was also the case in Bennett, supra, wherein the security agreement was not attached to the financing statement. 588 F.2d at 391.
On the other hand, GE's financing statement contained the following description of collateral:
"All inventory, new and used, presently owned and hereafter acquired,/ together with all proceeds of the sale or other disposition thereof, and all equipment, present and future, used or intended for use in conjunction therewith;/ and all accounts, contract rights, accounts receivable and general intangibles presently existing and hereafter arising, and all chattel paper covering the property above described together with any such property, returned to or repossessed by the Debtor."
Since Pa.'s agreement was not attached, Pa.'s claim must stand or fall on the description of collateral contained in the financing statement. In Bennett, we find the court holding as follows:
"Indication by `type', on the other hand, implies a more general mode of identifying collateral. The Bank contends that the broad categories of personal property used in Article 9 of the UCC, such as `consumer goods', `equipment', `farm products', and `inventory', UCC § 9-109; `account', `contract right', and `general intangibles', § 9-106; and `instrument', § 9-105(1)(g), constitute `types' of collateral within the meaning of section 9-402(1). We note that there is a controversy as to whether even these categories of property satisfy the statutory requirement of identification by `types'; we need not settle that controversy to reach a decision in this case. We do hold, however, that a financing statement like the Salls', which lists collateral less specifically than by reference to the categories of personal property contained in Article 9, does not comply with the statutory imperative of identification by `types'."588 F.2d at 392.
In accordance with Bennett we hold that the description in Pa.'s financing statement was insufficient with reference to the assets described as "various personal and business property" and, therefore, can only constitute an adequate filing as to "equipment".
On the other hand, there is no question that GE's description of the collateral in the financing statement was adequate. This description, however, only covers inventory and equipment "used or intended for use in conjunction therewith," i. e. in conjunction with the inventory of new and used mobile homes.
The Bankruptcy Judge has engaged in speculation in determining priority where the time stamp of GE is ahead of Pa.'s but Pa.'s numbers are ahead of GE's. It is sheer conjecture to imagine without evidence what might have occurred in the mail room of the Department of State which would explain this absurd situation, which so far as research by counsel and the court can determine is unique in the history of the Uniform Commercial Code.
There is nothing in the Uniform Commercial Code which says anything about the performance of quasi-judicial functions by the Department of State in determining whether to accept a financing statement for filing. Rather, under 9-302(1) reference is made to the filing of a financing statement and under 9-312(5)(a) the security agreement is perfected by "filing". We therefore hold that in the absence of evidence in this strange situation, the time stamps must control and therefore GE's security interest is superior to Pa's insofar as the rights of the parties are determined by the Uniform Commercial Code. This result gives GE a priority with *52 respect to equipment used in conjunction with the mobile homes and park but gives Pa. priority with respect to other equipment which was not covered by the GE description of collateral. We hold, however, that Pa.'s rights with respect to the 12 mobile homes themselves do not depend upon the filing of financing statements with the Department of State, but rather depend upon the certificates of title to the mobile homes under the old Motor Vehicle Code, as amended, and now displaced by the new Mobile Home Titling Act of July 25, 1977 P.L. 95 eff. Jul. 1, 1977 (68 Purdon's Pa. Stats. 1001, et seq).
Under the old Motor Vehicle Code, Act of April 29, 1959 P.L. 58, as amended, in effect at the time the titles were issued to Pa. covering these 12 mobile homes, it was provided (75 P.S. 201(a)) "No person who is a resident of this Commonwealth shall own a motor vehicle trailer or semi trailer in this Commonwealth unless a certificate of title therefore shall have been obtained as provided in this Act." Subsection (b) makes an exception with respect to "`manufacturers' and jobbers' vehicles consigned to dealers and with respect to new vehicles in the hands of dealers prior to sale."
Under 75 P.S. 102, "trailer" was defined as a "vehicle without motor power designed to carry property or passengers or designed and used exclusively for living quarters wholly on its own structure and to be drawn by a motor vehicle or tractor".
We recognize that under Pennsylvania law a certificate of title is not conclusive evidence of ownership, but in this case there is nothing to indicate that anyone other than Pa. had any rights of ownership in these 12 mobile homes.
When the new Vehicle Code (Act June 17, 1976, P.L. 162 generally eff. July 1, 1977) was enacted (See 75 Pa.Consol.Stats.Ann. 101, et seq.) a mobile home was again defined in Section 102. In Section 1101 there was a requirement for issuance of certificates of title for vehicles except as to vehicles where title was not required under Section 102 which excepts in subparagraph (10), "a mobile home".
The Pennsylvania legislature, however enacted the Mobile Home Titling Act. The findings and declarations of policy contained in Section 1002 are set forth in full as follows:
"(a) To facilitate the proper financing of mobile homes in the Commonwealth of Pennsylvania and the perfecting of security interest in connection therewith, there is a need for a certificate of title or ownership."
"(b) In the Commonwealth, certain housing units known as mobile homes traditionally have been considered vehicles and subject to various provisions contained in Pennsylvania's prior vehicle codes. One such provision was that requiring a certificate of title or ownership."
"(c) A result of this requirement was that lenders could perfect a security interest in the mobile home by, among other things, noting an encumbrance on the certificate of title or ownership; records thereof were kept so that potential lenders, dealers and purchasers could determine whether or not there was an existing encumbrance on the mobile home."
"(d) Pennsylvania's new vehicle code, title 75 of Pennsylvania Consolidated Statutes, provides that no certificate of title shall be issued for a mobile home. A very important result of this will be that there will be no means for perfecting a security interest in the mobile home by noting the encumbrance on the certificate of title. Furthermore, no records will be kept of a certificate of title, no records of encumbrances thereon and, consequently, no means by which lenders or dealers or purchasers are able to determine whether or not an encumbrance exists."
"(e) Because of the pending absence of a certificate of title or ownership for mobile homes, financial lending institutions have indicated that they may not provide purchase money security for mobile homes, or otherwise not consider the mobile home as collateral for a loan. This materially and adversely will affect an important segment of the housing industry *53 which is vital to Pennsylvania's economy."
"(f) It is, therefore, in the best interest of manufacturers, dealers, and purchasers of mobile homes, and of lenders of monies to purchasers of mobile homes, that the Commonwealth establish or otherwise continue to maintain a system of recording information relative to a certificate of title or ownership for mobile homes so that security interests may be perfected by notation thereon."
Section 1004, provides as follows:
Every owner of a mobile home which is in this Commonwealth and for which no certificate of title or ownership has been issued by the department or any public or private agency shall make application to the department for a certificate of title or ownership. No mobile home may be sold or otherwise have the ownership thereof transferred without the proper transfer of the certificate of title."
With respect to certificates of title for mobile homes under the previous law it was provided in Section 1011 as follows:
"Notwithstanding the provisions of Chapter 11 (relating to certificate of title and security interests) of Title 75 of the Pennsylvania Consolidated Statutes, which removes the requirement for obtaining a certificate of title or ownership and the perfection of security interest in mobile homes, provisions in prior laws requiring a certificate of title or ownership for a mobile home, and provisions relating to the perfection of a security interest in connection therewith, shall remain in force and effect."
Section 9-302(1) of the UCC provides that "A financing statement must be filed to perfect all security interests except the following: ... (d) ... a motor vehicle required to be licensed." These house trailers were not, however, motor vehicles which are self propelled by definition. Section 9-302(3) provides that: "The filing provisions of this article do not apply to a security interest in property subject to a statute ... (b) of this state which provides for central filing of security interests in such property, or in a motor vehicle which is not inventory held for sale for which a certificate of title is required under the statutes of this state if a notation of such a security interest can be indicated by a public official on a certificate or duplicate thereof." We hold that the first clause in § 9-302(3)(b) is applicable and that the next clause, with respect to motor vehicles and inventory held for sale, is inapplicable since a motor vehicle is described as a vehicle "which is self propelled" under 75 P.S. § 102.
It should further be pointed out that the 12 mobile homes in question were not inventory of the bankrupts held for sale since the bankrupts never had title to the same. They were not part of the bankruptcy inventory; they were simply mobile homes which were held for sale not in the bankrupt's place of business, but in the adjacent mobile home park. A clear title, however, to the mobile homes, under all the circumstances, at all times herein material, remained in Pa. There is no evidence that GE ever inquired into the certificates of title to these mobile homes or checked with the Bureau of Motor Vehicles to ascertain the status of titles to the same. Apparently GE never asked for any evidence of ownership on the part of the bankrupt.
Section 9-204(1) provides that "a security interest cannot attach until there is agreement ... that it attach and value is given and the debtor has rights in the collateral". In other words, if the debtor neither owns the collateral nor has title to it as in the instant case, he cannot create a valid security interest in the same.
Mother Lode Bank v. GMAC, 46 Cal. App.3d 807, 120 Cal.Rep. 429 (1975), was a similar case in which the court reviewed the California Vehicle Code which, like its Pennsylvania counterpart provides that titles must be registered with the state and certificates of title issued with encumbrances noted thereon. In that case certificates of title had been issued in the name of a bank on repossession of the vehicles which were left on the dealer's lot. The court held that "these sections provide the exclusive *54 method for perfecting security interests in motor vehicles (except vehicles in inventory stock.)" The court further held:
"We conclude that provisions of Section 9-204 of the Commercial Code are here controlling and compel a reversal of judgment. (The dealer), as debtor, did not acquire rights in the subject motor vehicles sufficient to transfer a valid security interest to (GMAC). The initial security interest created by issue of the ownership certificates of the vehicles by the Department of Motor Vehicles indicating (the Bank) as the legal owner is, and remains, the only valid security interest created. The action of (the dealer) in filing financing statements without either possessing the security interest in the vehicles or the ownership certificates could not effectively perfect a security interest in (GMAC)."
No Pennsylvania authority has been cited to the contrary. We will therefore follow the decision of the California court in the absence of a contrary Pennsylvania case particularly since the decision seems to be in accord with the law of Pennsylvania.
Section 1-102(2)(c) provides that the purpose of the UCC is "to make uniform the law among the various jurisdictions." See also, Girard Trust Corn Exchange Bank v. Warren Lepley Ford Inc. No. 2, 13 Pa.D. & C.2d 119 (1957).
Distribution in this case should therefore be made as follows:
(1) to First National Bank of Pennsylvania the following:

(a) Proceeds of 12 mobile home units $24,800.00
(b) Other equipment, grocery store 572.50
(c) Farm Machinery 10,336.50

(Sums due for sale of other equipment are to be distributed under Pa.'s security interest which is second in time and inferior to that of GE on equipment used in conjunction with mobile homes.)
(2) to General Electric Credit Corporation:

(a) Equipment for Mobile Home Park 4,674.00

(See second item in return of sale)
(3) to the Trustee, the balance of the items included in the return of sale inasmuch as we have held that Pa.'s filing statement contained an insufficient description of collateral and was second in time to GE's with respect to items of equipment for maintenance of the mobile home park.
The above distribution is, of course, subject to payment of sale and bankruptcy costs which have not been determined and subject also to reimbursement to Pa. for payment of taxes assumed by it on the mobile homes as set forth in the order of the Bankruptcy Judge.
As a result of the foregoing, we modify the order of distribution entered by the Bankruptcy Judge as set forth herein and remand the proceedings to him for entry of a final further distribution order and further proceedings as may be required.